S. Richard **PREWITT**, Appellant,

v.

**FIRESTONE TIRE & RUBBER COMPANY and Cigna Insurance, Appellees.**

No. 95–1098.

Court of Appeals of Iowa.

April 30, 1997.

Robert W. Pratt and Max Schott, Des Moines, for appellant.

Valerie A. Landis and Anne L. Clark of Hopkins & Huebner, P.C., Des Moines, for appellees.

Considered by SACKETT, P.J., and CADY, and HUITINK, JJ.

CADY, Judge.

The issue presented in this appeal is whether the Industrial Commissioner cor-rectly found a claimant sustained a scheduled loss based on an impingement syndrome in-jury to his right shoulder followed by treat-ment which included a resection of the distal clavicle. The district court affirmed the com-missioner. We conclude the findings of the commissioner were not supported by sub-stantial evidence. We reverse the district court and remand this case to the Industrial Commissioner.

Solomon Prewitt sustained an injury to his right shoulder on September 30, 1987, while working for Firestone Tire and Rubber Com-pany as a tire builder. The injury was even-tually diagnosed by Dr. Scott Neff, an ortho-pedic surgeon, as impingement syndrome of the right shoulder. This syndrome results when the space around the rotator cuff and surrounding bursa is narrowed, causing irri-tation to the cuff. Prewitt filed a claim for workers' compensation benefits.

Dr. Neff performed surgery which consist-ed of a Mumford resection of the distal clavi-cle. This procedure removed a small portion of the inferior surface of the acromion, as well as the small joint where the collar bone attaches to the acromion. The surgery suc-cessfully repaired the impingement and ac-cording to Dr. Neff, eventually restored full range of motion to Prewitt's right shoulder.

Dr. Neff concluded Prewitt sustained a five percent impairment to his "right upper ex-tremity," but "not to his body as a whole." Although he found Prewitt had full range of motion to his right shoulder, Dr. Neff as-signed a five percent impairment to Prewitt's "right upper extremity" based on the surgery he performed. Dr. Neff relied on the Ameri-can Medical Association's Guides to the Eval-uation of Permanent Impairment, as well as the Orthopedic Guidelines published by the American Academy of Orthopedic Surgeons, which he indicated recognize a permanent impairment to the "upper extremity" as a result of the type of surgery performed on Prewitt's shoulder.

Although there was evidence from another doctor that Prewitt did suffer a five percent impairment due to some loss of motion to his right shoulder, in addition to the five percent impairment due to the surgery, the Industri-

al Commissioner found Prewitt sustained a five percent impairment limited to his right arm. This finding followed an initial hearing, review hearing, judicial review, and remand hearing. The district court affirmed the Industrial Commissioner following the remand hearing and Prewitt appealed.

Prewitt claims the finding made by the commissioner that his impairment was limited to his "arm" was not supported by substantial evidence and was erroneous as a matter of law. He claims his impairment is a whole-body impairment as a matter of law. Firestone did not contest the finding that Prewitt's injury was work-related or that he suffered a five percent impairment to his "upper extremity."

We review workers' compensation cases for errors at law. *Second Injury Fund v. Hodgins,* 461 N.W.2d 454, 455 (Iowa 1990). The findings of the commissioner are binding unless a contrary result is required as a matter of law. *Wetzel v. Wilson,* 276 N.W.2d 410, 412 (Iowa 1979).

■ Our workers' compensation statute provides compensation for permanent partial disability for injuries to specific parts of the body pursuant to an established schedule. *See* Iowa Code § 85.34(2) (1995); *Second Injury Fund v. Nelson,* 544 N.W.2d 258, 269 (Iowa 1995). This schedule sets the compensation at a percentage of a workers' average weekly earnings over a certain number of weeks based on the location of the injury. *Id.* The purpose of scheduling injuries is to provide certainty of compensation after a specific injury has been sustained by a worker and to avoid controversies. *Gilleland v. Armstrong Rubber Co.,* 524 N.W.2d 404, 407 (Iowa 1994).

■ On the other hand, a permanent partial disability to an area of the body not identified in the schedule is compensated as an injury to the body as a whole. *Nelson,* 544 N.W.2d at 269. This disability is compensated like industrial disability, taking into account the loss of earning capacity. *Gilleland,* 524 N.W.2d at 407. Compensation of unscheduled injuries resulting in partial disability are also based on a greater number of weeks than scheduled injuries. Iowa Code

§ 85.34(2). Thus, the amount of compensation for an unscheduled injury is often much greater than for a scheduled injury.

Consequently, workers and employers frequently clash over the question whether a particular injury is scheduled or unscheduled. *See Mortimer v. Fruehauf Corp.,* 502 N.W.2d 12, 15 (Iowa 1993) (the difference in the amount of compensation between scheduled and unscheduled injuries makes the stakes high). This case illustrates one such clash.

■ The Industrial Commissioner found Prewitt sustained a loss to his arm, a scheduled injury. He construed Dr. Neff's opinion to exclude any impairment to the shoulder based on the medical findings that the range of motion tests showed no significant impairment to the shoulder. Consequently, the commissioner found the impairment rating given by Dr. Neff to Prewitt's "right upper extremity" necessarily excluded the shoulder and, as such, Prewitt failed to prove he sustained a whole-body injury. We conclude this finding is not supported by substantial evidence.

■ Losses to the "arm" are scheduled injuries. *See* Iowa Code § 85.34(2). Injuries to the shoulder, however, are unscheduled and should be treated as an injury to the body as a whole. *Nelson,* 544 N.W.2d at 269. In determining whether an impairment is scheduled or unscheduled, we look beyond the situs of the original injury and consider the impact of the injury on all parts of the body. *Barton v. Nevada Poultry Co.,* 253 Iowa 285, 290, 110 N.W.2d 660, 663–64 (1961). If an actual impairment occurs to an unscheduled portion of the body, a disability has been sustained to the body as a whole. *See Lauhoff Grain Co. v. McIntosh,* 395 N.W.2d 834, 840–41 (Iowa 1986).

Medical terminology used to describe an area of the body is not always compatible with the statutory terminology used to described an area of the body to classify a scheduled injury. This can present a problem when distinguishing scheduled losses from unscheduled losses. This problem is at the center of this case.

The medical profession has developed a uniform set of standards and guidelines for medical practitioners to utilize in evaluating permanent impairment and rendering opinions on the percentages of impairment. *See* AMA Guides to the Evaluation of Permanent Impairment (4th ed.1993) (hereinafter AMA Guides). The AMA Guides are a recognized authority in workers' compensation cases, and have been adopted in Iowa by administrative rule as a guide for determining permanent partial disability under our statutory compensation scheme. *See* 343 Iowa Admin. Code r. 2.4 (1995). Yet, unlike the governing statute, the guides do not use the term "arm" to describe an impaired area of the body. Instead, the guides use the phrase "upper extremity," defined to include four parts of the body: hand, wrist, elbow, and shoulder. AMA Guides at 13. Thus, the phrase "upper extremity" specifically includes the shoulder under the AMA Guides. Under the statute, the term "arm" excludes the shoulder. *Nelson*, 544 N.W.2d at 269.

■■■ The Industrial Commissioner was free to accept or reject, in whole or in part, the expert medical opinion testimony in this case. *See Sondag v. Ferris Hardware*, 220 N.W.2d 903, 907 (Iowa 1974). He was free to accept the testimony and opinion of Prewitt's treating physician, Dr. Neff, over the reviewing physician. However, there was no evidence, medical or otherwise, to support a finding that Prewitt's injury or impairment included the hand, wrist, or elbow. To the contrary, all of the evidence concerned an injury to the shoulder area. Dr. Neff repaired the irritation to the rotator cuff by removing portions of the acromion and clavicle bones. *See Continental Ins. Co. v. Pruitt*, 541 S.W.2d 594 (Tenn.1976) (injury to "upper extremity" supported award to whole body where all evidence related to an injury to the shoulder or joint between arm and shoulder and there was no testimony revealing any injury peculiar to the arm). Thus, under the AMA Guides, the five percent im-

pairment assigned by Dr. Neff to the "right upper extremity" could only have referred to the shoulder. Since our statutory scheme considers the shoulder to be an unscheduled injury, it would be improper to classify it as a scheduled injury. The workers' compensation statute cannot be extended beyond its expressed terms by applying it to a body member not expressly included. *Lauhoff*, 395 N.W.2d at 840. *See Safeway Stores, Inc. v. Industrial Comm'n*, 27 Ariz.App. 776, 558 P.2d 971, 974 (1976) (not proper to base award on loss of use to arm where injury is to shoulder).

■■■ We recognize the five percent impairment rating made by Dr. Neff was based on the surgical procedure he performed on Prewitt and not loss of motion. We further recognize a whole-body disability must be based on an actual impairment rather than on the surgical impairment alone. *Lauhoff*, 395 N.W.2d at 840–41. Nevertheless, the issue is not the existence or percentage of an impairment but whether it is scheduled or unscheduled. Moreover, the five percent impairment rating constitutes a medical opinion of an actual impairment.

The AMA Guides provide that resection arthroplasty of a joint leaves the patient with an impairment separate from an impairment recognized by the loss of motion to the joint.[1] AMA Guides at 61–62. The Guides calculate the impairment as a percentage of the "upper extremity." *Id.* However, the Guides specifically recognize the "upper extremity" is to be "considered a unit of the whole person." *Id.* at 13. Thus, they provide a chart to convert an impairment to the upper extremity to an impairment of the whole person. *Id.* at 20, table 3; *Shebester–Bechtel, Inc. v. Higginbottom*, 905 P.2d 1137, 1139 (Okla.App.1995) (physician was required to convert claimant's permanent partial shoulder injury to whole body impairment). Thus, a disability rating of five percent to the "upper extremity" and not to the body as a whole does not mean a scheduled injury to

1. Table 27 of the AMA guides provides impairment ratings for the upper extremity for arthroplasty of specific joints, based on different value assigned for simple resection arthroplasty or implant arthroplasty. AMA Guides at 61. The distal clavicle is included in the table and is as-

signed an impairment rating of the upper extremity. *Id.* In the event of decreased motion, "motion impairments are derived separately (Sections 3.1f through 3.1j) and *combined* with arthroplasty impairments using the Combined Values Chart (p.322)." AMA Guides at 62.

the arm has occurred. It merely means the impairment rating was not converted to a whole-body rating under the AMA Guides.

We believe the AMA Guides relied on by Dr. Neff in making his impairment rating required him to further convert the impairment of the "upper extremity" to a whole-body impairment in this case.[2] *Id.* at 1139. Our statute required this conversion because the undisputed evidence showed the arthroplasty impairment extended to the shoulder. There was no evidence this conversion was made.[3] Furthermore, the Industrial Commissioner erred by using the unconverted

rating to find the disability to be a scheduled injury to the arm.

We reverse and remand the case to the Industrial Commissioner for additional findings of an impairment to the body as a whole, and to determine the whole-body impairment compensation based on an unscheduled loss.

**REVERSED AND REMANDED.**

2. We recognize some "upper extremity" impairment ratings based on arthroplasty of bones or joints, although capable of conversion to the body as a whole under the AMA Guides, would not be converted to whole body impairments under our statute. If the injury is scheduled, the statute controls. *See Reagan v. Tennessee Mun. League*, 751 S.W.2d 842, 844 (Tenn.1988) (even though medical impairment rating may be translated under the medical guides into a whole body rating, if the injury is to a scheduled member only, the statute controls and no conversions may be made).

3. Dr. Neff did testify a five percent upper extremity rating would convert to a "two or three percent to the body as a whole." Table 3 of the AMA guides shows a five percent upper extremity rating converts to a three percent whole person rating. AMA guides at 20.